**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN YOUNIS,<br><br>Defendant. | **Criminal No. 0101 1:22CR10026-3** |

## SENTENCING MEMORANDUM OF JOHN YOUNIS

Defendant John Younis respectfully submits this memorandum in connection with his sentencing, scheduled for June 29, and requests a sentence of one month of home detention, including any other mandatory and special conditions that this Court may deem necessary, in addition to a reasonable monetary fine and forfeiture. This sentence is consistent with the facts of Mr. Younis' offense, and would fully foster public respect for the law and promote the goals of sentencing contained in 18 U.S.C § 3553(a).[1]

As is evident from the Pre-Sentence Report ("PSR") and letters submitted on his behalf, Mr. Younis is a devoted family man, committed member of his community, and trusted small business owner and employer. He is respected and relied on by his family, friends, and employees. Mr. Younis, however, made a serious mistake caused by a wholly uncharacteristic lapse in judgment, for which he has fully and promptly accepted responsibility. He understands that the misconduct that forms the basis for his guilty plea was wrong and must be punished. But by all

---

[1] The Presentence Report ("PSR") concludes that the applicable United States Sentencing Guidelines ("USSG" or "Guidelines") range is a term of imprisonment of 12 to 18 months (Zone C). The U.S. Attorney's sentencing recommendation contained in the plea agreement, however, is for a term of imprisonment at the lowest end of the Guidelines range and includes a term of supervised release with a condition that substitutes home detention for one-half of the term (*i.e.*, six months of incarceration and six months of home detention).

accounts, his actions constituted aberrant behavior for this otherwise law-abiding citizen.[2]  Given this context, including the facts of Mr. Younis' offense and the severe consequences Mr. Younis faces as a convicted felon alone, we respectfully submit that the sentencing recommendation contained in the plea agreement is not at all consonant with the directive of 18 U.S.C. § 3553(a) that Mr. Younis' sentence be sufficient, but not greater than necessary, to comply with the purposes of sentencing.  In contrast, the Defendant's recommended non-incarcerative sentence of one month home detention is entirely consistent with the goals of Section 3553(a), particularly in light of the sentences previously imposed in comparable insider trading cases, as well as the very detrimental consequences any term of incarceration will have on Mr. Younis' family-run business, and the long-time employees who rely on him.

## **BACKGROUND**

### I.    **Procedural Background**

On February 1, 2022, Mr. Younis and two other individuals were indicted on a two-count Indictment.  Count 1 charged Mr. Younis with Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. §§ 1349 & 1348, and Count 2 charged Mr. Younis with Aiding and Abetting Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff(a), 17 C.F.R. § 240.10b-5, & 18 U.S.C § 2.  Roughly a month later, on March 10, 2022, Mr. Younis entered a plea agreement with the United States Attorney for the District of Massachusetts (the "Plea Agreement"), and subsequently, on March 23, 2022, Mr. Younis plead guilty to Counts 1 and 2 in this Court pursuant to the terms of the Plea Agreement.  The Plea Agreement contains a stipulated Guidelines calculation resulting in an Offense Level of 13, which includes a 3-point reduction because Mr. Younis promptly accepted responsibility for his offenses and entered the Plea Agreement.

---

[2] The misconduct that forms the basis for Mr. Younis' guilty plea occurred over the course of several days nearly six years ago, and resulted in personal gain of approximately $52,000.

II.    **Personal Background**

A.    Mr. Younis' Family

Mr. Younis was born on September 27, 1962, in Boston, Massachusetts.  PSR ¶ 39.  His father, Edward Younis, passed away in 2015 after eventually succumbing to his battle with Parkinson's disease, and his mother, Dorothy Younis, passed away in 2019.  PSR ¶ 39.  Mr. Younis had a wonderful childhood by all accounts and enjoyed a close and loving relationship with his parents and two siblings, Steven Younis and Michelle Younis.  PSR ¶ 39-41.  Mr. Younis' family maintained an "average," middle-class financial status throughout his childhood.  PSR ¶ 39.  Mr. Younis was raised in Needham, Massachusetts but resided in Sharon and Hopkinton, Massachusetts for most of his life.  PSR ¶ 42.  Mr. Younis' friends from Hopkinton describe him as a "kind, generous, and thoughtful friend, loving husband, and dedicated father."  *See* Ex. 1 at 1 (Letter in Support by Jerrie Bernie-Chandler).[3]

Mr. Younis now resides in Bristol, Rhode Island with his wife, Katherine Younis, where they have lived since 2021.  PSR ¶ 42.  Mr. Younis and his wife married in 1987 and have enjoyed a loving and happy marriage since.  PSR ¶ 43.  Together they have three children: Christopher Younis (32), who resides in South Boston, Massachusetts and works with his father in their family construction company; Matthew Younis (28), who resides in California and is employed at Away Luggage Company; and Julie Younis (26), who resides in Jamaica Plain, Massachusetts, and is employed as a speech pathologist at the Newton Public School District.  PSR ¶ 43-46.

Mr. Younis has consistently been involved in his children's lives, taking an active role in their everyday care and activities.  One of his sons, Christopher, describes Mr. Younis as his "best friend," and shares the following about growing up with Mr. Younis as his father:

---

[3] All letters in support are annexed hereto as Exhibit 1.

> I couldn't have asked for a better father and role model growing up. His daughter, Julie, and son, Matt, are very close with [him]. He's also been a loving husband to my mother, Kathy, for 34 years. He would work so hard during the week and would sacrifice his weekends to drive his 3 kids to all our sporting events and acting classes. He would plan so many family bonding activities but more importantly, he would plan individual trips with each child based on our interests growing up. We are all lucky to have such a great person guide us through life and teach us family values we will take to our future children.

Ex. 1 at 3 (Letter in Support by Christopher Younis). In fact, Mr. Younis' commitment to his family is even well known to those outside of his immediate family. As one friend wrote in support:

> I am a middle school counselor and have worked at Wellesley Middle School spanning 31 years. On a daily basis, I interact with middle school children and their parents and I feel that I have a strong understanding of parenting styles. I can unequivocally say that John is a loving father with solid family values. I see how much his children care about him and what a rich presence he has in their daily lives.

Ex. 1 at 1 (Bernie-Chandler Letter). Likewise, another friend describes Mr. Younis as:

> [A] great family man. He is a loving husband and father to three well rounded, wonderful adult children . . . It is no surprise to me that John and Kathy raised such delightful children. I remember when his children were younger and in their impressionable years, John and Kathy would take time out of their busy schedules to bring them to volunteer at the Special Olympic charity events within their town. John and Kathy's value system and their need to help others lives strong within their children.

Ex. 1 at 5 (Letter in Support by Johnathan B. Sockol). Moreover, Mr. Younis has proven to care not just for the needs of his own family, but the families of others in his life. As a long-time employee of Mr. Younis' company explained, "John is a very family oriented person and has been more than understanding of any family or health issues I have dealt with over the [30] years of working for Priggen Ste[e]l. John has been there for all of his employees dealing with financial or personal problems." Ex. 1 at 8 (Letter in Support by Mark Mollicone). By way of another example, one of Mr. Younis' friends provides the

4

following anecdote of Mr. Younis risking his well-being to help his friend's family in a difficult situation:

> Another story that characterizes John's genuine goodness is how he helped my family one winter night. My husband and I were away for a weekend and my 75 year old mother was at my house watching my three children. That night we had a huge snowstorm that left at least 10 inches on our driveway. My mother was snowed in and could not shovel or snow blow our lengthy driveway. John drove through the storm to our house at 10:00 pm and cleaned our entire driveway. At first my mother didn't know what was happening, because neither she nor we had asked him to do this and it was so blustery that she could not see who was outside snow blowing our driveway. This is just one of the many examples of how John has helped us over the years and how John is a thoughtful friend, willing and able to help people.

Ex. 1 at 2 (Bernie-Chandler Letter).

    B.    <u>Priggen Steel</u>

Mr. Younis attended Needham High School in Massachusetts, where he graduated in 1981. PSR ¶ 54.  While still in high school, around 1980, Mr. Younis began working at his father's construction company, Priggen Steel Building Company, Inc. ("Priggen Steel"), located in Wrentham Massachusetts.  PSR ¶ 56.  Although he completed three years of college at the University of Massachusetts: Dartmouth, he did not return to finish his degree after taking a semester off, opting to join his father to grow the family business instead.  PSR ¶ 54.

Beginning in high school, Mr. Younis' father taught him how to run Priggen Steel, and over time Mr. Younis eventually mastered the business and became the sole owner of Priggen Steel in 2011.  PSR ¶ 56.  Priggen Steel is now a third-generation steel building company, which currently employs ten full-time employees.  PSR ¶ 56.  Of these ten employees, one has worked at the company for over thirty years, two have worked at the company for over twenty-five years, and three have worked at the company for over fifteen years, which exemplifies the reputation Mr. Younis has among his employees.  Indeed, the Priggen Steel employee who has worked there for

over thirty years described Priggen Steel as a "wonderful family run business" that "maintains a very high standard and respectful business for all of his employees." Ex. 1 at 8 (Mallicone Letter). This is largely because Mr. Younis strives to maintain both a close professional and personal relationship with his employees, which his son describes as "extremely even keeled and fair" in a professional setting. Ex. 1 at 4 (Christopher Younis Letter).

Mr. Younis is proud of Priggen Steel's growth, which he attributes to the quality of his employees' work and relationships, considering his employees as part of his family. PSR ¶ 57. Christopher explains:

> My father has built an excellent reputation in his 35+ years of working for Priggen Steel. People want to work for and with John because he is extremely even keeled and fair. Out of our eight employees; one has worked for over 30 years, two have worked over 25 years and 3 have worked over 15 years. It's a testament in an industry where employees bounce from company to company that they all want to stay and work for John. Employees and employers will ask me all the time if my father ever gets upset because even in the face of adversity that arises on the job, he always remains cool and calm.

Ex. 1 at 4 (Christopher Younis Letter). Likewise, when the COVID-19 pandemic hit in March 2020 and several Priggen Steel projects were cancelled or put on hold, Mr. Younis "made the decision to keep paying his workers their full wages to show his support in hopes that they would come back once the projects could continue." Ex. 1 at 2 (Bernie-Chandler Letter).

Mr. Younis is responsible for the day-to-day management of all aspects of Priggen Steel, often managing three to four projects simultaneously. Mr. Younis' son, Christopher, joined the company in 2012 after graduating from Roger Williams University and has worked with Mr. Younis at the company since then. Mr. Younis is currently mentoring and teaching Christopher how to run the business, as Mr. Younis' father did for him. And more recently, in March 2020, Christopher became a part owner of Priggen Steel. To this day, however, Mr. Younis remains

responsible for all of the day-to-day technical aspects of the business. PSR ¶ 47. It is these technical aspects that are so vital to Priggen Steel's ability to operate. Indeed, as Christopher explains, he "fear[s] for the future" of Priggen Steel and its employees should Mr. Younis be unable to come to work on a daily basis because it would be "impossible" for Christopher to take over his father's responsibilities at this time. *See* Ex. 1 at 4 (Christopher Younis Letter); *supra* at 15-16. Simply put, Priggen Steel cannot, and will not be able to, operate without Mr. Younis physically present each day.

C.    Commitment to Community

No matter where he has been located, Mr. Younis has exhibited a strong commitment to community throughout his life, often going "above and beyond" to help others in his community. For example, from 2003 to 2019, Mr. Younis has volunteered for, and donated to, the annual Sharon Timlin Road Race, a cause dedicated to raising money for ALS. Ex. 1 at 1 (Bernie-Chandler Letter); Ex. 1 at 5 (Sockol Letter). Upon hearing of the road race in 2003, Mr. Younis and his wife were "one of the first" in their community to volunteer, donating both generous monetary contributions and their time in order to make the event successful. Ex. 1 at 7 (Letter in Support by Abbie Rosenberg). More specifically, as the founder of the Sharon Timlin Memorial Event explained in her letter of support, Mr. Younis:

> [D]onated his time tirelessly to make the event successful. He also donated supplies from his company, and every year, aside from his time, also made a generous donation to this cause.

> Throughout the years, John and his family (who he brought in from the start to become a part of this event, which was 100% volunteer run), became trusted friends, who I spent time with both as a manager of this event, and as a family friends. I cannot say enough about John's character and his integrity. He is a hard working person, an invaluable member of the community, a dedicated volunteer for over 15 years and a role model to me as a friend, husband and father.

Ex. 1 at 7 (Abbie Rosenberg Letter.).

In addition, Mr. Younis and his employees at Priggen Steel volunteered to construct two wooden bridges for Central Trail, a public walking trail, as a donation to the town of Hopkinton, and for the past five years, Mr. Younis and Priggen Steel have been major sponsors for the Hummingbird Run in Wrentham, MA, a 5K/10K event aimed at promoting safe and responsible driving. Ex. 1 at 1 (Bernier-Chandler Letter).

Mr. Younis also has repeatedly made efforts to involve his family in giving back to the community. For example, Mr. Younis brought his children to volunteer for the Special Olympics many times over the years. Ex. 1 at 5 (Sockol Letter). Additionally, Mr. Younis and his family participate in the Fresh Air Fund, which is a not-for-profit youth development organization that provides free summer experiences for over 1.8 million children from New York City's underserved communities. Ex. 1 at 1 (Bernier-Chandler Letter). Mr. Younis and his family have coordinated the placement of children participating in the program with numerous Hopkinton host families, and often host participating children themselves for several weeks. Ex. 1 at 1 (Bernier-Chandler Letter).

Aside from his participation in charitable events, Mr. Younis also is known to go out of his way to help others in his community. In fact, his son, Christopher, described his father's "greatest quality" as "the way he goes above and beyond with acts to help others and his community." Ex. 1 at 3 (Christopher Younis Letter). For example, Christopher recalled the following memories from his childhood:

> There have been countless times he would come home from work unusually dirty because he would help others change their tires when they were pulled to the side of the road. Also, every spring, he would dedicate a weekend day by himself to plant flowers and mulch at the entrance of our neighborhood where hundreds of families lived. I always wondered as a young kid why he would spend his own money and time doing that when

> there are so many people that live in the neighborhood that could do it. As I got older, I really started to realize how cool that was of my father. So many people would approach him and thank him what he was doing. It really taught me how a simple act to help the community you live in can go a long way.

Ex. 1 at 3 (Christopher Younis Letter).

### D.     Emotional Effects of Crime on Mr. Younis

It is impossible to overstate the impact that this case has had on Mr. Younis and his family. Mr. Younis' personal and professional accomplishments are remarkable.  But for his guilty plea in this case, Mr. Younis has led a law-abiding life, filled with devotion to his family, his third-generation family business, and his community.  Despite decades of hard work and dedication to an accomplished professional life, he will now bear the stigma of being a convicted felon.

More painful than the professional consequences, however, is the despair of seeing the effects of the criminal investigation on his wife and three children.  Through their charitable efforts, the Younis family has become an integral part of their community.  The letters of support attached to this memorandum all echo the same themes: that Mr. Younis is a devoted husband, father, friend, and employer, who always goes above and beyond to help those around him.

When Mr. Younis' family and friends learned of the instant offense, they witnessed a side to him that they had never seen or experienced before.  Ex. 1 at 4 (Christopher Younis Letter). Friends who Mr. Younis has known for over 45 years had never seen him so emotionally upset and ashamed over what he had done.  Ex. 1 at 6 (Sockol Letter).  Although Mr. Younis exhibited remorse and fear due to the stress of his legal situation, his foremost concern was for his wife and children, as well as for their family business.  Ex. 1 at 4 (Christopher Younis Letter); Ex. 1 at 6 (Sockol Letter).  As a result of Mr. Younis' participation in the instant offense, this year has been the most emotional and stressful one for him and his family to date.  Ex. 1 at 4 (Christopher Younis Letter).

When Mr. Younis' friends learned of his involvement in the instance offense, they were surprised because it seemed "so out of character" for him. Ex. 1 at 5 (Sockol Letter). Those who have interacted with Mr. Younis over the past few months firmly believe that Mr. Younis would "never do anything like this again." Ex. 1 at 2 (Bernie-Chandler Letter). Mr. Younis has unequivocally accepted responsibility for his conduct, and has since focused his efforts on managing Priggen Steel, walking, and exercising to help him manage the stress of his legal situation. PSR ¶ 52.

## III.  **The Offense Conduct**

Mr. Younis grew up in Needham, Massachusetts with the two co-defendants in this case, David Forte and Gregory Manning. Indictment ¶ 4. Mr. Forte's close relative is a senior executive at Analog Devices, Inc. ("Analog"), a publicly-traded company based in Norwood, Massachusetts that designs and manufactures semiconductor products. *Id.* ¶ 5. On or about June 22, 2016, Analog submitted a proposal to acquire Linear Technology Corporation ("Linear"), a publicly-traded Delaware company based in Milpitas, California that designs and manufactures analog integrated circuits. *Id.* ¶¶ 7-8. Around this time, Mr. Forte's close relative began receiving information about the proposed acquisition in connection with his role at Analog. *Id.* Between June 22, 2016, and the public announcement of the Analog-Linear acquisition on July 26, 2016, Mr. Forte spoke with his close relative and obtained information about Analog's plans to acquire Linear. *Id.* ¶ 13. After obtaining this information, Mr. Forte shared this information with Mr. Younis and Mr. Manning. *Id.* ¶¶ 14-18.

After speaking with Mr. Forte, on or around July 21, 2016, Mr. Younis called his brokerage firm and purchased Linear call options. *Id.* ¶ 19. On July 22, 2016, Mr. Younis purchased shares

of Linear stock, and he also spoke with a business associate (identified as "Individual 2" in the Indictment) who in turn subsequently purchased Linear stock as well. *Id.* ¶ 23.

Analog's acquisition of Linear was announced on July 26, 2016, and Linear's share price rose from approximately $49 per share to over $64 per share before NASDAQ halted trading in Linear shares. PSR ¶ 12. On July 27, 2016, Mr. Younis sold his holdings of Linear call options and shares for a profit of approximately $52,000. Indictment ¶ 29; PSR ¶ 12. On or about the same morning, Individual 2 and Mr. Manning sold their holdings of Linear shares, earning a profit of approximately $11,000 and $35,000, respectively. Indictment ¶¶ 30-31; PSR ¶ 13.

## GUIDELINES

### I.   Offense Level

The 2021 Guidelines Manual, incorporating all guideline amendments, was used to determine Mr. Younis' offense level. USSG §1B1.11; PSR ¶ 17. In addition, Counts 1 and 2 are grouped for Guideline calculations purposes because the offense level is determined largely on the basis of the total amount of harm or loss. USSG §3D1.2(d); PSR ¶ 18. Under the 2021 Guidelines, Mr. Younis' base offense level is eight. *See* USSG §2B1.4(a); PSR ¶ 19. Mr. Younis' offense level is increased by eight points because the amount of total fraud loss was greater than $95,000 but less than $150,000. USSG §2B1.4(b)(1), USSG §2B1.1(b)(1)(E); PSR ¶ 20. Mr. Younis, however, also "clearly demonstrated acceptance of responsibility for the offense" (PSR ¶ 26) and promptly entered the Plea Agreement, which reduces his offense level by 3. USSG § 3E1.1; PSR ¶¶ 26-27. As a result, Mr. Younis' total offense level under the 2021 Guidelines is 13. PSR ¶ 28.

### II.   Criminal History

Mr. Younis has a total criminal history of zero, and according to the Sentencing Table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category

of I. PSR ¶ 32.

## III.    <u>Guidelines Sentencing Range</u>

Based upon his total offense level of 13 and a criminal history category of I, Mr. Younis' advisory Guidelines range is 12 to 18 months imprisonment.  *See* USSG § 5A (total offense level 13, criminal history category I); PSR ¶ 65.  Since the applicable Guideline range is in Zone C of the Sentencing Table, the Guidelines indicate that the minimum term (*i.e.*, 12 months) may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes home detention, provided that at least one-half of the minimum term is satisfied by imprisonment.  USSG § 5C1.1(d); PSR ¶ 65.  In addition, Mr. Younis is statutorily ineligible for probation because Count 1 (U.S.C. § 1349) is a Class B Felony.  18 U.S.C. § 3561(a)(1) (prohibiting probationary sentences for Class A and Class B felonies); *see also* PSR ¶ 70.

### A.    <u>U.S. Attorney Sentencing Recommendation</u>

Pursuant to the Plea Agreement, the U.S. Attorney recommends the following sentence for Mr. Younis:

i.    A term of imprisonment at the low end of the Guidelines sentencing range (i.e., 12 months), that includes a term of supervised release with a condition that substitutes home detention for one-half of the term (*i.e.*, 6 months of incarceration and 6 months of home detention);

ii.    A fine within the Guidelines sentencing range, unless the Court finds that Defendant is not able, and is not likely to become able to pay a fine;

iii.    24 months of supervised release;

iv.    A mandatory special assessment of $200; and

v.    Forfeiture in the amount of $51,725.00.

B.    Mr. Younis' Sentencing Recommendation

With the now long-advisory Guidelines, courts in this district and across the country routinely depart downward based on the sentencing factors set forth in U.S.C. § 3553(a).  *See, e.g., United States v. Nunez*, 840 F.3d 1, 4 (1st Cir. 2016).  Here, considering the statutory sentencing factors, comparable insider trading sentences, Mr. Younis' personal and professional background, his critical day-to-day role in this family run business, and the COVID-19 pandemic, Mr. Younis submits that a non-incarcerative sentence is warranted and, indeed, necessary to prevent the precise sentencing disparities that the Guidelines are intended to address.  Therefore, Mr. Younis respectfully requests that this Court order a sentence consisting of one month home detention, including any other mandatory and special conditions that this Court may deem necessary, and the monetary fines and forfeiture as recommended by the U.S. Attorney.

**ARGUMENT**

I.    **The Goals of 18 U.S.C. § 3553(a) Are Best Served by a Sentence of Home Detention and an Appropriate Fine.**

While the Guidelines are merely "advisory," "district courts are still required to 'begin all sentencing proceedings by correctly calculating the applicable Guidelines range.'"  *United States v. Millan-Isaac*, 749 F.3d 57, 66–67 (1st Cir. 2014) (quoting *United States v. Gall*, 552 U.S. 38, 49 (2007)).  The Supreme Court, however, has ruled that a sentencing court should not even presume a sentence within the advisory Guidelines range will comply with the statutory purposes of sentencing.  *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original).  Thus, "after the court has calculated the applicable guidelines range, sentencing becomes a judgment call, and a variant sentence may be constructed based on a

complex of factors whose interplay and precise weight cannot even be precisely described." *United States v. Ofray-Campos*, 534 F.3d 1, 42 (1st Cir. 2008) (internal quotations omitted).

Specifically, in rendering "an individualized assessment based on the facts presented," the Court must consider the seven factors identified in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 50; *see also* 18 U.S.C. § 3553(a)(1) & (6) (listing, among other factors, the nature and circumstances of the offense and the need to avoid unwarranted disparities in sentencing). In addition, when sentencing a defendant, the Court "shall impose a sentence sufficient, but not greater than necessary," to comply with the sentencing goals set forth in Section 3553(a). 18 U.S.C. § 3553(a). Those goals reflect the need to consider not only the nature of the offense itself and the individual defendant, but also the general need for the sentence imposed. Among other factors, the Court shall consider:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –

   a. To reflect the seriousness of the offense to promote respect for the law, and to provide just punishment for the offense;
   b. To afford adequate deterrence to criminal conduct;
   c. To protect the public from further crimes of the defendant; and
   d. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

3) The kinds of sentences available[.]

*Id.* Moreover, "[d]ecisions that involve weighing the § 3553(a) factors are within the sound discretion of sentencing courts." *United States v. Caballero-Vazquez*, 896 F.3d 115, 120 (1st Cir. 2018) (quoting *United States v. Santini-Santiago*, 846 F.3d 487, 492 (1st Cir. 2017)). An analysis of the relevant factors in the context of this case indicates that a sentence of one month home detention is more than sufficient to meet the goals of sentencing.

A.    Mr. Younis' Personal Characteristics And Life History Demonstrate That A
Sentence Of Home Detention Is Specifically Appropriate In This Case.

As an initial matter, home detention is an alternative to traditional imprisonment or
substitute form of punishment.  U.S.S.G. § 5C1.1(e).  Indeed, the Sentencing Guidelines allow
the Court to impose a term of home detention that is an equivalent substitute to a term of
imprisonment under the Guidelines' Schedule of Substitute Punishments.  U.S.S.G. §
5C1.1(e)(3) (stating that a court may substitute "[o]ne day of home detention for one day of
imprisonment").  In other words, a Court is able to sentence a defendant to strictly home
detention if it finds such a sentence reasonable.  *See, e.g., U.S. v. Weeks*, 2003 WL 22671543
(S.D.N.Y. Nov. 12, 2003) (sentencing defendant to 12 months of home detention and a term of
supervised release, despite a sentencing guidelines range of 37-46 months).

Second, as indicated in the PSR and Section II.B above, if Mr. Younis were incarcerated
for *any* period of time, it would not only naturally negatively impact his family but would also
have significant and dire consequences for the employees of Priggen Steel and their families.
This is not a hypothetical.  It is a distinct and real possibility that Priggen Steel may not survive
if Mr. Younis has to spend any amount of time away from the business while incarcerated.  Mr.
Younis' son, Christopher, who is part owner of Priggen Steel, explained the reality of this dire
situation in his letter of support:

> I fear for the future of our company and employees if John were gone. I
> have learned so much from him but there are still aspects of the business I
> would have no idea how to proceed without his knowledge. We have so
> many jobs coming this summer all over Rhode Island and Massachusetts
> that it would be an impossible job for me to keep up with the day-to-day
> operations while trying to find work for the fall and winter months ahead.

Ex. 1 at 4 (Christopher Younis Letter).  Thus, incarcerating Mr. Younis would no doubt have a
detrimental and unwarranted impact the lives of other hardworking citizens who had nothing
whatsoever to do with the relevant offense conduct.  This outcome, however, is not necessary

here.  Therefore, the defense urges the Court to consider sentencing Mr. Younis in a manner—

home detention—that allows Mr. Younis to remain in a position to continue to run and operate

Priggen Steel day to day.

> B.    The Recommended Sentence Is Appropriate And Will Deter Mr. Younis From
>       Any Future Misconduct And Protect The Public Because There Is Little Chance
>       Mr. Younis Will Reoffend.

A sentence of home detention would both "afford adequate deterrence to criminal

conduct" and "protect the public from further crimes of the defendant" under 18 U.S.C. §

3553(a)(2)(B)-(C).  Under 18 U.S.C. §§ 3553(a)(2)(B) and (a)(2)(C), this Court must also

consider "the needs for the sentence imposed—. . . to afford adequate deterrence to criminal

conduct. . . [and] to protect the public from further crimes of the defendant."  Prison sentences do

not automatically result in public safety.  While "[p]rison is an important option for

incapacitating and punishing those who commit crimes," evidence suggests that prison sentences

do not have a "chastening " effect and "produce at best a very modest deterrent effect."  *Five

Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).  With

respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught

is a vastly more powerful deterrent than the punishment," and that "[s]ending an individual

convicted of a crime to prison isn't a very effective way to deter crime."  *Id.* (emphasis in

original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*,

Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by

criminologists concluding that "across all offenders, prisons do not have a specific deterrent

effect.  Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial

sanctions.").

As for Mr. Younis specifically, any period of incarceration is unnecessary to deter him from future criminal conduct or protect the public.  Mr. Younis poses no threat to society, and a sentence of imprisonment is unnecessary to guard against future criminal conduct by Mr. Younis.  Mr. Younis is 59 years old, at an age at which he otherwise would be preparing to retire from working entirely but for the repercussions of his conviction on his retirement savings.  Mr. Younis has no significant criminal record and has led a law-abiding and commendable life.  While the misconduct that forms the basis of Mr. Younis' guilty plea was wrong, it was unquestionably an aberration.  Mr. Younis is truly remorseful for his conduct and has done everything within his power to attempt to atone for it.  He understands that he must be held accountable for his actions, but incarceration is not necessary to achieve the goals of sentencing.  In light of these factors, it is inconceivable that Mr. Younis will come before this or any other Court again.

From every vantage point, especially in light of the anticipated requirement that he will have to pay a very substantial amount in fines, it is clear that no more than one month of home detention adequately reflects the nature of the offense, promotes respect for the law, and provides a just punishment of Mr. Younis.  In addition, this sentence would provide an adequate specific and general deterrence to criminal conduct and protect society from further criminal conduct by Mr. Younis.  The defense respectfully submits that Mr. Younis has clearly demonstrated his acceptance of responsibility by virtue of his guilty plea, which he entered into in a timely and prompt fashion.  By imposing the recommended sentence, this Court will allow Mr. Younis to continue to work, provide for his family, and keep Priggen Steel in operation to the benefit of his innocent and hardworking employees.

C.    <u>The Recommended Sentence Is Necessary To Avoid Sentencing Disparities With Other Comparable Insider Trading Cases.</u>

To be sure, Mr. Younis' crimes are serious, and in pleading guilty to the Government's "loss" calculation of approximately $98,000 he agreed that such amount represents all proceeds arguably traceable to the commission of the offenses for purposes of its calculation under the Guidelines.  *See* PSR ¶ 20.  Mr. Younis is not challenging the calculation of that loss amount. However, he respectfully submits that the Guidelines' application of that loss amount—which is the key driver of the overall offense level and resulting advisory sentencing range under the Guidelines—overstates Mr. Younis' culpability.

Although each defendant is unique, looking to other defendants charged with similar indictments can provide some guidance to help avoid unwarranted sentencing disparities.  Even where a defendant presents no special mitigating circumstances, a sentencing court may vary downward from the advisory guideline range based solely on its view that the guideline sentence creates an unwarranted disparity within the meaning of § 3553(a), and is at odds with that section.  *See Spears v. United States*, 555 U.S. 261, 263-264 (2009).  The Court must consider the need to avoid unwarranted disparities among defendants convicted of similar criminal conduct with similar fraud loss, but it should also avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range.  *See Gall*, 552 U.S. at 55.

An overview of defendants charged with similar crimes,[4] most of whom incurred more in fraud loss than Mr. Younis, illustrates that home detention is the most appropriate form of punishment in this case:

---

[4] As shown in the chart, the majority of these defendants pled guilty to conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, while Mr. Younis has pled guilty to conspiracy to commit securities fraud in violation of U.S.C. § 1349.  The underlying conduct, insider trading, however, *is the same*.  Additionally, many of the

| Case / Defendant | Charge | Fraud Loss | Sentence |
|---|---|---|---|
| *U.S. v. Peterson*, 2011 WL 5223012 (S.D.N.Y. Nov. 1, 2011)<br><br>H. Clayton Peterson | One Count Conspiracy to Commit Securities Fraud<br><br>One Count Securities Fraud (18 U.S.C. §§ 371 and 2, and 15 U.S.C. §§ 78j(b) and 78ff) | **$63,000** in individual loss | **Two years' probation**, with three months to be served in home detention, with sentencing guidelines range of 12-18 months |
| *U.S. v. Slaine*, 2018 WL 8737886 (S.D.N.Y. Mar. 5, 2018)<br><br>David Slaine | One Count Conspiracy to Commit Securities Fraud (18 U.S.C. § 371)<br><br>One Count Securities Fraud (15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. §§ 240.10b-5, 240.10b5-2) | **$532,387** in personal profits; **$3.9 million** total loss fraud | **Three years' probation**, with sentencing guidelines range of 46-57 months' |
| *U.S. v. Edelman*, 2006 WL 1148701 (S.D.N.Y. Apr. 24, 2006)<br><br>Lee Edelman | One Count Securities Fraud (15 U.S.C. §§ 78j(b); 17 C.F.R. §§ 240.10b-5 and 240.10b5-2) | **$22,786** in individual loss | **Three years' probation**, six months of which to be served through home detention, with sentencing guidelines range of 6-12 months |
| *U.S. v. Anderson*, 267 Fed. Appx. 847 (11th Cir. 2008)<br><br>Patrick Anderson | One Count Securities Fraud (15 U.S.C. §§ 78j(b), 78ff(a); 17 C.F.R. § 240.10b-5) | **$135,000** in individual loss | **Three years' probation,** including home detention for six months, with sentencing guidelines range of  18-24 months |
| *U.S. v. Nichols*, 376 F.3d 440 (5th Cir. 2004)<br><br>Logan Nichols | One Count Insider Trading (18 U.S.C. § 371) | **$230,475** in individual loss | **Five years' probation**, 12 months of which to be served in home detention and 500 hours community |

defendants identified in the chart served a sentence of probation that included a term of home detention.  Mr. Younis, however, is statutorily ineligible for probation because Count 1 (U.S.C. § 1349) is a Class B Felony.  18 U.S.C. § 3561(a)(1) (prohibiting probationary sentences for Class A and Class B felonies); *see also* PSR ¶ 70.

| | | | service, with sentencing guidelines range of 12-18 months |
|---|---|---|---|
| *U.S. v. Russ*, 1998 WL 230992 (S.D.N.Y. May 6, 1998)<br><br>Blake Russ | Conspiracy to Commit Securities Fraud (18 U.S.C. § 371)<br><br>Wire Fraud (18 U.S.C. § 371)<br><br>Commercial Bribery (18 U.S.C. § 371) | **$11,800** in individual loss | **Probation with six months' home detention**, with sentencing guidelines range of 4-10 months |
| *U.S. v. Weeks*, 2003 WL 22671543 (S.D.N.Y. Nov. 12, 2003)<br><br>David Weeks | Two Counts Conspiracy to Commit Securities Fraud, Mail Fraud, and Wire Fraud (18 U.S.C. § 371)<br><br>One Count Wire Fraud (18 U.S.C. § 1343)<br><br>One Count Perjury (18 U.S.C. § 1621) | **$1,151,649** in individual loss<br><br>**$88,833,095** in total loss | **Twelve months' home detention**, followed by three years' supervised release on each count, with sentencing guidelines range of 37-46 months |

In the context of these cases, sentencing Mr. Younis to imprisonment would create an unwarranted disparity in sentencing. Given that the defendants above received non-incarcerative sentences, Mr. Younis should not equally receive a sentence of imprisonment. Consideration of all relevant factors leads to the clear conclusion that any sentence of incarceration is particularly inappropriate for Mr. Younis.

  D.  <u>The COVID-19 Pandemic Further Supports a Sentence of Home Detention.</u>

Being incarcerated during the COVID-19 era causes a very different imprisonment punishment. Since the beginning of the COVID-19 pandemic, inmates have served time under harsher conditions – movement is limited, visits were suspended, and inmates have been detained

in their cells for a large majority of the day.  While the Bureau of Prisons has gone through several phases to modify restrictions on inmates, social visits are limited to maintain safety, and "[i]nmate movement in small numbers is authorized for . . . showers three times each week."  *See* Fed. Bureau of Prisons, *BOP Modified Operations* (Updated Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp.  Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 296 inmates have died from COVID-19.  *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/.  With the rise of COVID-19 variants, as well as the recent increase in daily cases in the general population,[5] the risks of contracting the virus and death remain a serious concern for inmates, even for those who have been vaccinated because of breakthrough infections.[6]

The court system's response to COVID-19 reflects the dangers that remain in present circumstances, especially for individuals most vulnerable to harm from the virus located in highly-concentrated areas, like prisons.  Indeed, numerous courts have found that the threat of COVID-19 presents "extraordinary and compelling reasons" for compassionate release in instances with far more serious offense conduct and more significant criminal histories than Mr. Younis.  Further, especially against this backdrop, there is little sense (and sentencing value) in further burdening the prison system and saddling the public with the cost of Mr. Younis' incarceration based on his offense conduct.  For these additional reasons, a sentence of strictly home detention is appropriate under the circumstances.

---

[5] According to the CDC, as of June 3, 2022, there were a total of 84.424,159 total cases and 1,003,308 deaths nationwide.  This includes a daily average of 99,289 new cases and 246 new deaths.  *See* https://covid.cdc.gov/covid-data-tracker/#datatracker-home.

[6] An article published in the New England Journal of Medicine highlighted a problem for those in prison even if they are vaccinated: ". . . even a vaccine with seemingly adequate efficacy, pace, and coverage may be insufficient to alter the fundamental population dynamics that produce high disease prevalence."  *See* N. Engl. J. Med. 2021; 384:1583-1585, Vaccination plus Decarceration – Stopping COVID-19 in Jails and Prisons | NEJM.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Younis respectfully requests that this Court order a non-incarcerative sentence consisting of one month home detention, including any other mandatory and special conditions that this Court may deem necessary, in addition to a reasonable monetary fine and forfeiture.

Dated: June 23, 2022                    Respectfully submitted,

                                        /s/  Jennifer L. Chunias

                                        Jennifer L. Chunias (BBO # 644980)
                                        Emily M. Notini (BBO # 703765)
                                        Dylan Schweers (BBO # 698461)
                                        JChunias@goodwinlaw.com
                                        **GOODWIN PROCTER LLP**
                                        100 Northern Avenue
                                        Boston, MA 02210
                                        Tel.: (617) 570 1000
                                        Fax.: (617) 523 1231

                                        *Attorney for Defendant John D. Younis*

<u>**CERTIFICATE OF SERVICE**</u>

I, Jennifer L. Chunias, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the non-registered participants as known this 23rd day of June, 2022.

*/s Jennifer L. Chunias*
Jennifer L. Chunias