UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN YOUNIS,<br><br>Defendant | No. 1:22-CR-10026-3-RWZ |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States respectfully submits this memorandum in support of its request that the Court sentence defendant John Younis to six months' imprisonment and six months' home detention, a sentence that satisfies the minimum term of the applicable Federal Sentencing Guidelines ("Guidelines") range.

Background

On July 27, 2016, John Younis made a profit of nearly $52,000 by selling shares of common stock and call options that he had purchased only days before. That quick profit—a return on Younis's investment of approximately 89 percent—was Younis's illicit gains from an insider trading scheme.

Younis traded in these securities while in possession of material nonpublic information ("MNPI") that he received from co-defendant David Forte. As summarized in the Pre-Sentence Report ("PSR"), Forte's close relative, identified in the indictment as Individual 1, was a senior executive at Analog Devices, Inc. ("Analog"), a semiconductor company based in Massachusetts. PSR ¶ 9. In June 2016, Individual 1 learned that Analog had submitted a proposal to acquire Linear Technology Corporation ("Linear"), a public company based in California, and began

receiving confidential information about the deal. PSR ¶ 10. Thereafter, Forte obtained MNPI about Analog's plans to acquire Linear from Individual 1. *Id.*

Forte shared this MNPI with his lifelong friends, Younis and co-defendant Gregory Manning. PSR ¶¶ 9-10. Forte, Younis, and Manning grew up together in Needham, Massachusetts and vacationed together as adults. PSR ¶ 9. After a conversation with Forte, Younis deposited $60,000 into his brokerage account on July 18, 2016. PSR ¶ 11. The account previously had a balance of less than $500 and no activity since October 2015. Indictment ¶ 16. After several additional conversations with Forte, Younis purchased 35 Linear call options on July 21, 2016. *See* Indictment ¶ 19; PSR ¶ 11. And after speaking with Forte again, Younis purchased 1,100 shares of Linear stock on July 22, 2016. *Id.*

Younis also used the MNPI about Analog's plans to acquire Linear to benefit a business associate, identified in the indictment as Individual 2. After receiving the MNPI from Forte and purchasing his own securities, Younis spoke with Individual 2, who purchased 1,000 shares of Linear stock on July 22, 2016. *See* Indictment ¶¶ 17, 23; PSR ¶ 11. During the same period in which Forte and Younis communicated, Forte also provided the MNPI to Manning, and Manning also purchased shares of Linear stock for his and his spouse's brokerage accounts. PSR ¶ 11.

On July 26, 2016, the Bloomberg news service reported that Analog was in "advance talks" to acquire Linear, and Younis exchanged calls with Forte and Individual 2. *See* Indictment ¶ 26. Linear's share price rose from approximately $49 per share to over $64 per share before NASDAQ halted trading. PSR ¶ 12. After unsuccessfully attempting to sell his Linear securities on July 26, and after speaking with Forte again the following morning, Younis sold his holdings of Linear call options and shares on July 27. *Id.* In addition to the nearly $52,000 in profits that Younis received, the insider trading scheme resulted in profits of approximately $35,000 for Manning and

approximately $11,000 for Individual 2, after both individuals also sold their Linear securities on July 27, 2016. PSR ¶ 13.

Younis pleaded guilty to securities fraud and conspiracy to commit securities fraud on March 23, 2022. PSR ¶ 2.

## Argument

For the reasons below, Younis deserves a sentence at the low end of the applicable Guidelines range.

- Younis understood that the source of the MNPI was Individual 1, Forte's close relative. Younis also understood that Individual 1 was entrusted with confidential information by his employer and that Forte and Individual 1 had a relationship of confidence and trust. Moreover, Younis knew that Forte was a police officer, entrusted by the public to enforce and obey the law. In these ways, Younis knew that each tip from Forte was a willful betrayal of trust.

- Younis capitalized on the tips from Forte anyways. Despite being an infrequent investor, Younis decisively purchased approximately $60,000 in Linear securities over just a few days. His investment included call options that would have been valueless had Linear's share price not jumped. With the MNPI, Younis almost doubled the money he invested in less than one week's time, in a single bet on a single securities issuer. Younis's trading cheated other investors who did not have access to MNPI about Analog's plans to acquire Linear.

- Younis also used the MNPI from Forte to engender goodwill with Individual 2, a fellow business owner who purchased steel buildings from Younis's business. Younis tipped Individual 2 and set him up to profit from the MPNI. By passing along the MNPI from Forte to Individual 2, Younis caused additional illicit trading that further cheated other investors.

Younis's actions require a sentence that reflects the seriousness of insider trading, promotes respect for the securities laws, and affords adequate general deterrence. *See* 18 U.S.C. § 3553(a)(2)(A-B). The securities markets are entrusted with the life savings, retirement savings, and pensions of many individual shareholders. The markets rely upon fairness and transparency, in appearance and actuality. Yet quick profits from illegal stock tips among friends are tempting and common. Insider trading undermines confidence in the public securities markets. *See* Victor

Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Harv. L. Rev. 322, 356 (1979) ("If the market is thought to be systematically populated with ... transactors [trading on the basis of misappropriated information] some investors will refrain from dealing altogether, and others will incur costs to avoid dealing with such transactors or corruptly to overcome their unerodable informational advantages").  Sentences for insider trading are necessary to adequately deter the many people who have access to inside information, including from their friends' and/or family members' work, and who are tempted to exploit that advantage.

Insider trading, especially outside the closely regulated confines of securities professionals, is easy to commit but hard to uncover and prove.  While securities professionals—such as fund managers or brokers—are directly regulated by the various financial regulatory authorities, nonprofessionals like Younis are under no such supervision.  There are limited tools for policing the quiet passing of illegal stock tips among a close group of nonprofessional friends, especially where the tipper who obtained and shared the MNPI did not himself trade, as is commonly the case and as is the case here.  Because of the limited number of insider trading prosecutions relative to the incidence of insider trading, where the government does successfully prosecute a case of this kind, sentencing should reflect the need to deter the many others who might otherwise engage in this kind of misconduct.  The First Circuit has acknowledged the significance of sentences that promote general deterrence in the cases of white-collar defendants.  *See United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (the deterrence of white collar crime was "of central concern to Congress" in fashioning sentences for white collar crime).  The literature also supports sentences promoting general deterrence in this context, because increased and publicized prosecution of insider trading *does* result in less insider trading—that is, because general deterrence in this context works.  *See*, *e.g.*, Del Guercio, D., et al., *The Deterrence Effect of SEC*

*Enforcement Intensity on Illegal Insider Trading* (Sept. 2013), avail. at http://corpgov.law.harvard.edu/2013/07/19/the-deterrence-effect-of-sec-enforcement-intensity-on-illegal-insider-trading/ (abstract and link to full article; statistical analysis finding correlation between deterrence and intensity of SEC enforcement); Gider, J., *Do SEC Detections Deter Insider Trading? Evidence from Earnings Announcements* (Dec. 2013), avail. at http://econstor.eu/bitstream/10419/100343/1/VfS_2014_pid_430.pdf (analyzing sample of 398 earnings announcements in which SEC detected insider trading activity; finding deterrent effect on future trading). The Guidelines applicable to insider trading take the need for this kind of general deterrence into account.

The sentence should also reflect Younis's specific conduct and the interests of specific deterrence. *See* 18 U.S.C. §§ 3553(a)(1) and (2)(C). Younis was not the corporate insider or the immediate tipper of the MNPI. However, when presented with the MNPI from Forte, he knew how to profit from it and had the financial means to do so. Moreover, he then took on the role of the tipper. By sharing his advantage with Individual 2, Younis involved another person in the insider trading scheme and caused more trades that cheated unwitting investors, all to derive additional benefit from the MNPI—Individual 2's goodwill. The readiness with which Younis capitalized on the MNPI and passed it along suggests that Younis found nothing troubling about the sharing of illegal stock tips with buddies and cautions in favor of a Guidelines sentence.

Finally, a Guideline sentence is necessary in this case because every insider trading transaction has a nameless victim on its other side. Younis and Manning each made quick profits on improbably well-timed bets on Linear's share price, which, based on the MNPI from Forte, they knew would take off. But there were traders on the other side of those bets who suffered losses and who never suspected that their counterparties had inside information to which they were

5

not privy.  A Guidelines sentence here acknowledges the harm from insider trading, protects the trading public, and promotes respect for the securities laws.

The government and the defendant agree that Younis's total offense level under the Guidelines is 13, resulting from a base offense level of eight (USSG §2B1.4(a); PSR ¶ 19), an eight-point increase for total gains from the insider trading conspiracy greater than $95,000 (USSG §2B1.4(b)(1), USSG §2B1.1(b)(1)(E); PSR ¶ 20), and a three-point reduction for Younis's acceptance of responsibility (USSG § 3E1.1; PSR ¶¶ 26-27).  The resulting Guidelines range is 12 to 18 months' imprisonment.  Because this range is in Zone C of the Sentencing Table, the Guidelines indicate that the minimum term may be satisfied by a sentence of imprisonment or a sentence of imprisonment substituting home detention, provided that at least one-half of the minimum term is satisfied by imprisonment.  *See* USSG § 5C1.1(d); PSR ¶ 65.

A term of imprisonment satisfied in half by home detention is appropriate in this case, based on Younis's prompt acceptance of his responsibility in the scheme.  However, the government respectfully submits that home detention alone would represent a significant and unwarranted departure from the Guidelines and would disserve the sentencing goals under 18 U.S.C. § 3553(a).  Further, a non-incarcerative sentence would perpetuate sentencing disparities between white-collar defendants and defendants who commit other crimes motivated by the desire to obtain money, who have not enjoyed the kinds of benefits that the defendant highlights for the Court in his sentencing memorandum (as personal characteristics and life history)—a stable upbringing, family support, strong community, and business success.  These privileges underscore the need for meaningful consequences to deter insider trading by others who would engage in it despite their material security and community standing.  Younis had every advantage; he had no need for the quick profit and no reason to cheat.

Conclusion

For the foregoing reasons, Younis should be sentenced to six months in prison and six months of home detention, followed by three years of supervised release.[1] Such a sentence is appropriate and not more than necessary to reflect the seriousness of the offense, promote respect for the law, appropriately punish this defendant, and send a clear deterrent message to those who are tempted to take advantage of access to inside information to cheat the markets and ordinary investors.

                                    Respectfully submitted,

                                    RACHAEL S. ROLLINS
                                    United States Attorney

By:   /s/ David M. Holcomb
        DAVID M. HOLCOMB
        Assistant United States Attorney
        John Joseph Moakley United States Courthouse
        1 Courthouse Way, Suite 9200
        Boston, MA 02210
        (617) 748-3000

Dated: June 27, 2022

---

[1] The government has also filed a motion for forfeiture of property, ECF No. 72.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                        /s/ *David M. Holcomb*
                                        David M. Holcomb
                                        Assistant United States Attorney

Date: June 27, 2022